# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**DOREEN DEAGUILA, et al.,**

      **Plaintiffs,**

**v.**                                        **Case No.  8:10-cv-1058-T-30AEP**

**BRIGHT HOUSE NETWORKS, LLC and**
**ADVANCE NEWHOUSE PARTNERSHIP,**

      **Defendants.**
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendants' Motion for Summary Judgment (Dkt. 73), Plaintiffs' Response in opposition (Dkt. 85), and Defendants' Reply (Dkt. 91).  The Court, having considered the motion, response, reply, record evidence, and being otherwise advised in the premises, concludes that Defendants' motion should be granted in its entirety and summary judgment awarded in their favor.

## PLAINTIFFS' CLAIMS

Plaintiff Doreen DeAguila alleges violations of the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and the Florida Civil Rights Act ("FCRA"), against Defendants Bright House Networks, LLC and Advance Newhouse Partnership.  The remaining Plaintiffs opted-in to Count I of DeAguila's third amended complaint and thus have only ADEA claims.

Defendants move for summary judgment on the entirety of Plaintiffs' claims.

## RELEVANT BACKGROUND

Defendants are in the business of providing cable television, telephone, and hi-speed internet services in West Central Florida.[1]  Plaintiffs worked (and Plaintiff Ella Williams still works) in the Pinellas sales call center as inbound sales representatives.  The call center was generally staffed by approximately thirty-five agents, four leads, and various supervisory personnel.  Alicia Patterson was and is the Senior Sales Manager for the inbound sales group for the Pinellas region.  Patterson was responsible for the overall operations and oversight of that group.  Arthur Lee was one of the supervisors of that group.

Plaintiffs' positions required them to sell the cable company's services to callers, including answering questions, and handling orders for new services.  Pinellas sales agents are compensated with a base hourly rate of pay, commissions on sales, and paid time off ("PTO").

Pinellas call center supervisors communicated with their employees in person and via instant messaging.  Pinellas sales agents received incoming calls through an automated telephone system.  The availability of agents to take calls was critical to the efficient operation of the call center and to customer satisfaction.  Defendants required that all sales agents sign into the computer system when they began work, sign out at the end of the shift and, when an agent was not available to take calls during the day for some reason, to notify

---

[1] The parties dispute whether Defendant Bright House Networks, LLC employed Plaintiffs.  Because the Court concludes, as discussed herein, that Defendants are entitled to summary judgment on Plaintiffs' claims, it need not address any dispute related to which entity actually employed Plaintiffs.

the system.  Defendants also monitored the agents adherence[2] (also known as compliance), to ensure that the agent was available to take customer calls.

The record reflects that an agent was not limited by the number of unscheduled restroom, smoke, or other personal breaks he or she took, however, unscheduled breaks affected the agent's adherence number, which also affected the agent's compensation.

According to Plaintiffs, the adherence criteria steadily increased as follows: from November 2005 to October 2006, Plaintiffs had to perform at a level of 90% to obtain a "meets standard" schedule adherence score; from November 2006 to October 2008, Plaintiffs had to perform at a level between 95%-96% to obtain a "meets standard" score; and, at some point after October 2008, Plaintiffs had to perform at 97% to obtain a "meets standard" score. According to Plaintiffs, the increase in the adherence performance criteria severely impacted their ability to take bathroom breaks, because taking an unscheduled break to use the restroom would lower their adherence score.

According to Defendants, the cable industry has dramatically changed in the past seven years and these changes affected the operation of the call center in which Plaintiffs worked.  In an effort to respond to the industry changes and be more competitive, especially against new competitors like Verizon, Defendants made numerous changes to the sales agents' compensation plan.  Defendants also made changes to the sales agents' working

---

[2] "Adherence" is the time during an agent's scheduled shift that he/she is available to take customer calls or work on approved activities (such as post-call data entry wrap-up), expressed as a percentage, after deducting scheduled breaks.

conditions, including changes to the shift-bidding process, and changes to the adherence policy.

For example, in late 2006 or early 2007, Defendants began exploring changes to its compensation plan for sales agents in order to encourage them to sell certain services, to reward top performers, to bring personnel costs into line with agents' production, and to standardize pay practices across the division. In developing the new plan, Defendants studied the existing compensation plan, the pay practices of other companies in the industry, and market surveys. Defendants decided to make three primary changes to the inbound sales agents' compensation. Although the parties do not dispute the details of these changes, which are described in their papers, they do dispute whether the changes discriminated against older employees. According to Defendants, an agent's age did not affect his/her base hourly rate, PTO tier, or commission tier.

The September 2007 compensation plan caused some Pinellas agents' total compensation to increase and some to decrease. The record reflects that, statistically, the changes to the compensation plan had no significant impact on the earnings of the agents over forty, but the earnings of agents under forty decreased in a statistically significant manner.

In early 2008, the Pinellas sales group implemented a performance-based system of shift assignments. In prior years, Pinellas sales agents only changed shifts if an opening occurred because of an agent's departure, but Patterson thought that performance-based shift bidding would encourage agents to perform better. Under the performance-based shift

bidding system, agents who received higher rankings would pick from the available shifts before the lower-ranked agents.

The performance-based shift bidding system has continued for all sales agents since Spring 2009.   Agents are ranked for shift bidding based on 20% seniority and 80% performance metrics.  According to Defendant, the rankings were strictly numerical, i.e., age was never a factor in the bidding system, and eight of the top ten ranked agents in the Spring 2009 shift bid were over forty years of age.

Plaintiff DeAguila performed generally satisfactorily as a Pinellas sales agent.  She requested and received "work at home" status in 2004 (when she was forty-one years of age) and, therefore, worked at Defendants' office only several days per month for the rest of her employment.

According to DeAguila, she suffered from hypertension that worsened as a result of Defendants implementation of the "rigid and disparate new policies" discussed above.  Her hypertension medication caused frequent urination as a side-effect.  Plaintiff also suffered from a panic disorder.

On July 16, 2008, DeAguila commenced an approved leave of absence pursuant to Defendants' Family and Medical Leave Act ("FMLA") policy based upon her anxiety disorder and panic attacks.  She subsequently provided a certification from her doctor, in August 2008, which stated in part that her condition was long-term and that she would not be able to return to work in the next two years.  On October 1, 2008, Defendants sent DeAguila a letter stating that her position needed to be replaced.  Although DeAguila

exhausted her FMLA leave in September 2008, the company maintained her employment and benefits until July 2009, an additional ten months beyond what was required under the FMLA. DeAguila's employment was terminated after she failed to return to work after one full year.

Plaintiffs Corbin, Kendrick, Sexauer, Shea, and Starratt also were replaced and subsequently terminated after they did not return from extended medical leaves of absence and after it appeared that there was no prospect that they would return to their positions.

The two senior employees responsible for Pinellas sales agents are both over forty years of age (Patterson, who is now forty-five, and Ellen Adams, Director of Customer Care, who is now fifty-eight).

## STANDARD OF REVIEW

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine

the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

### I.  Plaintiffs' ADEA Claims

The Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*, makes it unlawful for an employer to discriminate against any employee "because of"

that individual's age.  *Id.* § 623(a).  "[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action."  *Gross v. FBL Financial Services, Inc.*, 129 S.Ct. 2343, 2352 (2009).

The Court concludes that Plaintiffs fall woefully short of demonstrating a genuine issue of fact for trial.  The evidence Plaintiffs do point to is predominantly conclusory and based on Plaintiffs' speculation, opinions, or beliefs.  For example, Plaintiffs argue, without pointing to any <u>specific</u> record evidence, that Defendants' new policies, discussed above, were implemented to eliminate older inbound sales representatives.  But other that stating this argument in general terms, Plaintiffs do not identify a single younger comparator who was treated more favorably.

Plaintiffs claim that sales calls were routed away from them to supposedly "younger" agents.  But, again, this claim is not grounded in any real facts, other than Plaintiffs' beliefs, because they overheard other (but unidentified) agents allegedly taking sales calls when Plaintiffs were taking service calls.  Plaintiffs also speculate that the telephone system software could be used to route calls to certain individuals.  And Plaintiffs believe that their supervisors sent them instant messages during the day to distract them and slow them down, with the intent to get rid of them and other older employees.

Plaintiffs also spend a lot of time discussing their individual medical conditions, such as panic disorder, anxiety, stress, hypertension, and frequent urination.  Plaintiffs point to evidence that older employees were forced to urinate or defecate in their pants, due to

Defendants' rigid and oppressive policies. But Plaintiffs' medical conditions are not relevant to their ADEA claims. In short, Plaintiffs' heavy focus on their medical conditions and Defendants' failure to accommodate their conditions does nothing to establish that Defendants' policy changes were based on their age, or that their age was the "but-for" cause of any adverse employment action they suffered.

The record is undisputed that Defendants' policy changes applied to all sales agents, i.e., the younger inbound sales agents and the older inbound sales agents. And the record reflects not even a scintilla of evidence that age was a factor when Defendants were determining and analyzing the changes necessary to be more competitive in the industry. Indeed, the statistical evidence suggests that the older sales agents fared better than the younger sales agents after the policy changes.

Plaintiffs' claims are also undermined by the fact that the senior management of the Pinellas sales group, who were largely responsible for creating or implementing the personnel changes at issue, are ages fifty-eight and forty-five. *See Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) ("[Plaintiff] faces a difficult burden here, because all of the [decisionmakers] . . . were well over age forty and within the class of persons protected by the ADEA. [They] are more likely to be the victims of age discrimination that its perpetrators").

In short, this is not a close case. Plaintiffs do not offer evidence sufficient to go to a jury that their ages were any factor, much less a "but-for" factor, in the Defendants' policy decisions and treatment of them. Notably, Plaintiffs often admitted during their depositions

that their claims were based on their suspicions or feelings, not facts, or they disclaimed any connection between a challenged plan/practice/goal and age. Interestingly, Plaintiffs' response ignores their deposition testimony and focuses almost entirely on their declarations filed in support of their response. But even Plaintiffs' declarations do not salvage their claims because they make sweeping conclusions of age discrimination that are insufficient to create a genuine and material disputed fact sufficient to go to a jury.

Plaintiffs similarly cannot carry their burden of proving that Defendants' facially-neutral policies had a disparate impact on them. To establish a prima face case of disparate impact, Plaintiffs first must demonstrate "that [a] facially neutral employment practice ha[s] a significantly discriminatory impact" on individuals in a protected class. *E.E.O.C. v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1274-75 (11th Cir. 2000) (omissions in original). Second, they must "demonstrate causation by offering statistical evidence sufficient to show that the challenged practice resulted in prohibited discrimination." *See Spivey v. Beverly Enterprises, Inc.,* 196 F.3d 1309, 1314 (11th Cir. 1999). If Plaintiffs are able to establish a prima facie case, Defendants must then respond with evidence that the challenged practice is not only related to the position in question, but is also consistent with business necessity.

While Plaintiffs identified the specific employment practice (Defendants' policy changes related to adherence, compensation, scheduling, routing of calls, etc.), they failed to present any statistical evidence demonstrating that Defendants' policies had a disproportionate impact on older employees. The evidence they presented, a report by Dr. Richard Gold, M.D., who opines that "schedule adherence and restroom break policies

instituted by Defendants have a disproportionately hard effect on people over the age of 40 (when compared to younger populations not yet predisposed to the onset of the aging process)" falls short of the substantial statistical evidence needed to support Plaintiffs' disparate impact claims. *See Joe's Stone Crab,* 220 F.3d at 1274-75 (stating that the statistical evidence must be of a kind and degree sufficient to show that the *practice in question* has *caused* the denial of members of a protected group access to employment opportunities because of their membership in the protected group)(emphasis added) (*citing Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 995 (1988)). *See also MacPherson v. University of Montevallo,* 922 F.2d 766, 771 (11th Cir. 1991)(noting that "'a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack.' [T]o show that there is an imbalance is not enough.")). Absent such statistical evidence, Plaintiffs' claims fail as a matter of law.[3]

Finally, even assuming, for the sake of argument, that Plaintiffs could establish a prima facie case of discrimination based on age, Defendants offer legitimate and non-discriminatory reasons for their actions and Plaintiffs do not establish that these reasons are pretext for discrimination based on age.

After a plaintiff has shown a prima facie case of discrimination and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to

---

[3] Plaintiffs' evidence is in stark contrast to Defendants' statistics which disprove age-based disparate impact and demonstrate that: (1) Pinellas sales agents over forty years of age fared better under the 2007 compensation plan than the sales agents under forty; (2) Pinellas sales agents over forty years of age had statistically significant better adherence than their younger colleagues; and (3) in the Spring 2009 (second) shift bid ranking of sales agents, eight percent of the top ten ranked sales agents were over the age of forty.

articulate a legitimate, nondiscriminatory reason for its actions. *See Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000).

If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons. *Chapman*, 229 F.3d at 1024-25.

Here, the record reflects that Defendants had legitimate, non-discriminatory business reasons for their actions. The record reflects evidence that Defendants based the 2007 changes to the Pinellas sales agents' compensation plan on their interest to increase sales and achieve greater consistency across various company regions, especially in light of the industry changes at the time and the increase in competition. The record also reflects that Defendants' performance-based shift bidding policy and vacation bidding policy were done to encourage the agents to perform at a higher level. And the adherence system was implemented to ensure adequate agent coverage in light of forecasted calls. In sum, the record reflects that the majority of the decisions Plaintiffs challenge in this lawsuit were

statistically-based and data-driven.  In other words, the record reflects that Defendants were acting upon and motivated by reasonable factors other than age.

Finally, Plaintiffs do not demonstrate any evidence of pretext.  Plaintiffs admitted that they were not involved in the decision-making process and that they have no knowledge of the reasoning behind Defendants' decisions.  Plaintiffs also admitted that they had never heard or seen derogatory comments about older employees during their employment.  The majority of Plaintiffs' response focuses on their medical conditions and Defendants' failure to accommodate them, which is immaterial to a claim under the ADEA.  In other words, Plaintiffs' arguments about night blindness, bathroom breaks, and panic attacks have nothing to do with whether Defendants' non-discriminatory and legitimate reasons are really pretext for discrimination <u>based on age</u>.  And Plaintiffs' arguments about the way their phone calls were routed, Defendants' instant messaging practice, Defendants' failure to provide safety training, and Defendants overall "harassment" of them are based on Plaintiffs' own evaluations and opinions that these actions were based on their age or done to get rid of older employees, which are insufficient to establish pretext.  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1332-33 (11th Cir. 1998); *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).

For these same reasons, any constructive discharge claim similarly fails.  *See Bryant v. Jones*, 575 F.3d 1281, 1298-99 (11th Cir. 2009) (noting that to prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment).  As set forth above,

Plaintiffs do not point to evidence sufficient to go to a jury that demonstrates they suffered a hostile working environment or experienced severe or pervasive harassment <u>based on their age</u>.[4]

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' ADEA claims.

## II.   DeAguila's Claims

The record reflects that Defendants are entitled to summary judgment on DeAguila's claims of disability discrimination, hostile work environment, and retaliation.  The parties do not dispute the law on this issue.  Although the Court would typically discuss the elements of these claims, it sees no reason to do so here, because these claims, like Plaintiffs' ADEA claims, fall woefully short of defeating summary judgment.  This is so, among other reasons, because DeAguila cannot demonstrate that Defendants' legitimate and non-discriminatory reasons for the alleged discrimination and retaliation she suffered were really pretext.

DeAguila claims that she is disabled by a "panic and anxiety disorder."  Even if the Court assumes that DeAguila is disabled and that Defendants knew of her disability, and that DeAguila suffered an adverse action, she points to no evidence demonstrating that she suffered any adverse action <u>because of</u> her disability.  She also does not demonstrate that she suffered any adverse action <u>because she</u> engaged in protective activity.  In other words, the

---

[4] Under Plaintiffs' version of the law on this issue, any employee over the age of forty who takes FMLA leave and separates her employment due to stress, anxiety, and or panic, or, as one Plaintiff stated, a "mental breakdown," should have an actionable constructive discharge claim.  Fortunately, this is not the state of the law.

record is bereft of any causal connection.  And, as set forth above, Defendants offered legitimate and non-discriminatory reasons for their actions.

Indeed, DeAguila herself admits that she went on FMLA leave and did not return to her job because of her panic disorder.  The record is undisputed that Defendants did not separate her employment until she failed to return to her job after one year.  The record also reflects that DeAguila's termination was consistent with Defendants' treatment of other employees who failed to return to their jobs after remaining on FMLA leave for a period of one year.

DeAguila also does not point to any evidence suggesting that she identified to Defendants or requested from Defendants a specific accommodation which was both reasonable and would have allowed her to perform the essential functions of her job.

Finally, DeAguila's evidence of Defendants' harassment during her employment is insufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment as a matter of law.  *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999).  Indeed, a review of the case law on this issue would reveal to even a non-lawyer/lay person that DeAguila's claims of harassment/hostile work environment are painfully deficient.

Accordingly, Defendants are entitled to summary judgment on DeAguila's claims.[5]

It is therefore ORDERED AND ADJUDGED that:

---

[5] Given the Court's ruling, it need not discuss Defendants' remaining arguments in favor of summary judgment.

1.    Defendants' Motion for Summary Judgment (Dkt. 73) is GRANTED.

2.    The CLERK is directed to enter final summary judgment in favor of Defendants and against Plaintiffs.

3.    The CLERK is directed to close this case and terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida on December 21, 2011.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2010\10-cv-1058.msj73.frm